# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES J. PICKENS, | : | |
|   Plaintiff, | : | CIVIL ACTION |
| | : | No. 15-1489 |
| v. | : | |
| | : | |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : | |
|   Defendant. | | |

August 29, 2017                                                                                                                                    Anita B. Brody, J

## **MEMORANDUM**

In 2015, Plaintiff James Pickens, a mechanic, brought suit against his current employer, Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"). Pickens asserted two Title VII causes of action, a failure to promote claim and a retaliation claim. ECF No. 1. A five-day jury trial was held from February 27 to March 3, 2017. ECF No. 53. The jury found against Pickens' on his failure to promote claim, but found in his favor on the retaliation claim. The jury awarded Pickens nominal damages of $1.00. ECF No. 60.

Because I ruled that any economic losses would be considered post-trial, Pickens now moves for an award of lost wages, specifically for lost overtime pay, which he alleges stems from the retaliation he suffered. He also seeks back pay for the five days he was present at trial, ECF No. 59, as well as attorney's fees and costs. For the reasons set forth below, Pickens' motion for lost wages is denied, and his motion for attorney's fees and costs is granted in part and denied in part.

**I.    BACKGROUND**

Plaintiff James Pickens, an African American, is a second-class mechanic currently employed by Defendant SEPTA at the Berridge Shop. In 2012, Pickens sought a promotion to first-class mechanic. In August of that year, he was denied the promotion and he asserted that the promotion protocol, which included a series of on-the-job trainings and a performance exam, was infected by racial discrimination. He also asserted that after he complained to management about his promotion denial and filed a complaint with the Equal Opportunity Employment Commission ("EEOC"), SEPTA retaliated against him. He claimed that he was subjected to coworker abuse, and that management retaliated against him by issuing him a series of disciplinary infractions and assigning him to do repair work in a burdensome area of the shop.

In 2015, Pickens filed a Complaint against SEPTA in which he alleged several acts of retaliation, including abusive treatment and undeserved disciplinary write-ups. ECF No. 1. But in the lead up to and during trial, Pickens expanded his theory of retaliation. In his pretrial memorandum, Pickens asserted that SEPTA's retaliatory conduct included a restriction on his ability "to work overtime." ECF No. 24 at 4. Pickens also testified at trial, albeit briefly, that he felt his overtime opportunities were restricted after he complained of discrimination. Trial Tr. vol. 1, 78:9-21, Feb. 27, 2017. However, in his proposed jury instruction, he listed only "work assignments and harassment by SEPTA's employees" as ways the jury could find retaliation. ECF No. 25 at 22. The jury was consequently not instructed on lost overtime as a form of retaliation.

On June 13, 2017, an oral argument and evidentiary hearing was held on the issue of lost wages and attorney's fees. ECF No. 72.  At the hearing, Pickens did not call any witnesses, but presented evidence of overtime receipts and pay stubs. SEPTA called one witness, Mike Civera,

2

former Director of Maintenance, to testify to the overtime procedures at the Berridge Shop.

Between 2010 and 2014, Pickens worked the following number of overtime hours:

| Year | Hours of Overtime |
|---|---|
| 2010 | 105 |
| 2011 | 151 |
| 2012 | 13 |
| 2013 | 24 (all in January) |
| 2014 | 72.5 (all before 3/29/14) |

Pl.'s Br. Lost Wages 3, ECF No. 77. Pickens claims his overtime pay was restricted during the following periods:

- February 1, 2013 – December 31, 2013 (immediately after filing his EEOC complaint on January 30, 2013). ECF No. 77 at 9.

- March 29, 2014 – May 31, 2014.[1] ECF No. 77 at 9.

Pickens also provides the overtime numbers for all other second-class mechanics during the periods of alleged retaliation. The overtime numbers are as follows:

|  | **All of 2013**[2] | **3/29/14 – 5/31/14**[3] | **All of 2014** |
|---|---|---|---|
| B. Petrocelli | 231.5 | 104 | 432.5 |
| L. Simmins | 111 | 42.5 | 192 |
| D. Stevens | 121 | 99 | 496 |
| D. Fleming | 120 | 40 | 144 |
| L. Council | N/A | 65 | 264 |
| W. Ditheodore | 421.5 | Not provided | Not provided |
| D. Berry | 133 | Not provided | Not provided |

---

[1] Pickens received 72.5 hours of overtime for the first three months of 2014, but nonetheless claims retaliatory denial of overtime occurred between the end of March 2014 and the end of May 2014. He alleges in his brief, "[i]t is not known why Plaintiff received overtime in the beginning of 2014 but Plaintiff suspects that Defendant was (correctly) instructed by counsel or upper management to stop retaliating against Plaintiff." Pl.'s Br. Lost Wages 6, ECF No. 77. He does not seek an award for lost overtime after "June 2014" because he was out of work for shoulder surgery, and therefore ineligible to receive overtime. Beginning in 2015, the responsibility for assigning overtime at the Berridge Shop switched from management to the union, and therefore Pickens does not claim any retaliation occurred after January 1, 2015. *Id.* at 2.

[2] For simplicity, overtime numbers for all of 2013 are presented, mirroring what Pickens provides in his brief, even though Pickens only claims retaliation for the eleven months beginning on February 1, 2013. Including the month of January in the comparison does not affect my analysis because Pickens had more overtime in that one month than either Felipe Suarez or Dave Taylor had the entire year.

[3] Numbers calculated by subtracting the value "as of 3/29/14" from the value "as of 5/31/14" provided in Pls.' Br. Lost Wage 6-7, ECF No. 77.

| | | | |
|---|---|---|---|
| R. Toby | 60 | 64 | 379 |
| F. Suarez | 18 | 0 | 56 |
| D. Taylor | 20 | 40 | N/A[4] |
| M. Butler[5] | 0 | 0 | 0 |
| *J. Pickens* | *24 (all in January)* | *0* | *72.5* |

Pl.'s Br. Lost Wages 5-7, ECF No. 77.

For lost wages stemming from retaliatory denial of overtime, Pickens seeks an award commensurate with his "average overtime over the years." Pl.'s Br. Lost Wages 9, ECF No. 77. For 2013, this amounts to approximately $9,000 for the eleven months he did not work overtime. For the second quarter of 2014, Pickens seeks an amount "similar" to what he earned in the first quarter of 2014, approximately $3,000. In sum, he seeks $12,438 plus 6% interest to the present day.

Additionally, Pickens seeks an award of attorney's fees in the amount of $380,051 and an award of costs in the amount of $5,912.81. Pl.'s Br. Attorney's Fees 9, ECF No. 76.

## II. DISCUSSION

Pickens claims that immediately following the filing of his EEOC complaint on January 31, 2013, SEPTA retaliated against him by denying him the ability to earn overtime for the rest of the year. Furthermore, he argues that he faced retaliation via denied overtime in the second quarter of 2014, prior to leaving work for shoulder surgery in June 2014. SEPTA responds that Pickens is not entitled to back pay for lost overtime because he did not present the issue to the jury as a form of retaliation, and therefore SEPTA was not on notice of this element of damages. Def.'s Supp. Resp. Damages and Attorney's Fees 1, ECF No. 78. SEPTA further argues that even if Pickens is eligible for back pay, his lost overtime is too speculative and difficult to quantify, and therefore his claim should be denied.

---

[4] David Taylor worked 94 hours of overtime up until June 2014, after which he was promoted.
[5] Pickens alleges that he has "first hand knowledge that Butler does not seek nor want overtime work." Pl.'s Br. Lost Wages 6, ECF No. 77.

4

With respect to attorney's fees, Pickens claims he is the prevailing party and therefore eligible for an award of a reasonable fee. SEPTA argues that in nominal damages cases, attorney fee awards are disfavored, and Pickens' case does not present any special circumstances to overcome this presumption against fee awards.

a. **Back Pay**

A successful Title VII plaintiff can collect "back pay . . . , or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). Lost wages, also known as back pay, are "designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 84 (3d Cir. 2009). The amount of back pay awarded is calculated by comparing the amount of wages the plaintiff would have earned, absent the unlawful discrimination, and the amount of wages the plaintiff actually earned. *Hare v. Potter*, 549 F. Supp. 2d 688, 692 (E.D. Pa. 2007) (citing *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 156 (3d Cir.1999)).

Back pay, "is not an automatic or mandatory remedy, but 'one which the courts may invoke' at their equitable discretion." *Donlin*, 581 F.3d at 84 (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415 (1975)). Whether or not to award lost wages to a prevailing plaintiff is a matter of discretion for the court. *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006). Like other elements of damages, a plaintiff has the burden of proving back pay by a preponderance of the evidence. *See* Third Circuit Model Civil Jury Instruction § 5.4.3 (March 2017).

There is a general presumption in favor of back pay awards after a finding of discrimination in violation of Title VII. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). But back pay cannot be awarded from thin air. "A 'back pay remedy must be specifically

5

tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices.'" *Hare*, 549 F. Supp. 2d at 695 (quoting *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 900 (1984)). "Damages cannot be awarded if it is uncertain whether the damages sought resulted from the unlawful act." *Id*. (*citing Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). A plaintiff "cannot rest her entitlement to back pay on mere speculation about what she would have earned in the absence of discrimination." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 824 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 198 (2016) (citation omitted). In the context of overtime back pay awards, other courts to consider the issue have found that "the question of whether [the plaintiff] would have earned any overtime is entirely too speculative to impose additional damages for such hypothesized work." *Curtis v. Robern, Inc.*, 819 F. Supp. 451, 459 (E.D. Pa. 1993).

I decline to award back pay for lost overtime in this case. The overtime numbers presented by Pickens do not clearly evince a retaliatory denial of overtime pay. Though he presents the overtime hours of all second-class mechanics, because seniority is an influential factor in the awarding of overtime, only those mechanics with less seniority than Pickens present a relevant comparison.[6] There were three second-class mechanics with less seniority than

---

[6]   Neither party has conclusively established the process through which overtime is assigned at the Berridge Shop. At the hearing, SEPTA attempted to argue that the collective bargaining agreement dictated overtime assignments based upon seniority. However, SEPTA did not (and has not) provided the collective bargaining agreement that was in force at the times Pickens claims retaliation. Further, Defendant called Mike Civera, Director of Maintenance, to testify that seniority dictated overtime opportunities. However, Mr. Civera did not work at the Berridge Shop in 2013, when Pickens alleges the retaliation began. H'rg Tr. 37:24, June 13, 2017, ECF No. 74. Therefore, as Plaintiff's counsel correctly pointed out at the hearing, the idea that overtime assignments are based only upon seniority, "assumes a fact which is not in evidence." H'rg Tr. 18:1-3. Further, as revealed at the hearing, even the determination of seniority itself is a complicated process. Mr. Civera testified that seniority for overtime assignment purposes is not merely a function of who has been a second-class mechanic the longest, but also takes into account experience with the relevant job type and seniority within individual working groups. H'rg Tr.: 42:24-25; 44:4-9.These are known as craft seniority and working group seniority. H'rg Tr. 44:4-9; 52:12-15. Neither party presents seniority lists broken down by individual working groups or crafts. Therefore, it is not possible to determine conclusively which employees should have been given overtime based upon seniority on any given day at the Berridge Shop during the periods in question.
    Nonetheless, SEPTA has established that seniority is at least a consideration in determining overtime

Pickens during the periods in question: Felipe Suarez, David Taylor and Michael Butler. H'rg Tr.: 42:9-11, June 13, 2017, ECF No. 74. *See also* Def. Post-Trial Ex. 1.

Although it is suspicious that Pickens did not earn any overtime pay in 2013 after January, when he complained of discrimination, there also appears to be a precipitous drop in overtime pay for the other two low-seniority second-class mechanics during that year. Felipe Suarez earned no overtime from February 17, 2013 until November 23, 2013, and still earned fewer overtime hours in all of 2013 than Pickens earned in January alone. Def. Post-Trial Ex. 5 at 2. Similarly, Dave Taylor earned 20 hours of overtime in January and February of 2013, but none for the rest of the year. Def. Post-Trial Ex. 6 at 1-2. Other courts in this district have found that "suspicious" timing is "insufficient evidence" to support an award of back pay damages. *Hare*, 549 F. Supp. 2d at 697 (E.D. Pa. 2007) ("Although it is 'suspicious' that plaintiff's career path was drastically altered after she complained of sexual harassment, insufficient evidence exists to support defendant's unlawful conduct caused back pay damages or to quantify those damages in any meaningful fashion.") (citation omitted).

Furthermore, Pickens' drop in overtime in 2013 was preceded by a similarly drastic drop in overtime in the previous year, for Pickens and other mechanics. Even though he was partially ineligible in 2012 because he was enrolled in a training course and on injury leave, Pl.'s Br. Lost Wages 3, ECF No. 77, Pickens worked a mere 13 hours that year. Felipe Suarez similarly worked only 21 hours. Pl.'s Br. Lost Wages, Ex. 1 at 0047, ECF No. 77. In early 2012, nearly a year before making any allegations of discrimination and weeks before seeking a promotion,

---

assignments, at least for the periods in which Mr. Civera was Director of Maintenance at the Berridge Shop. Mr. Civera, who made overtime decisions at the Berridge Shop, H'rg Tr. 37:19-22, testified that such decisions include a variety of data points, including overall seniority and who is available to work, but most importantly, "seniority within the work group." H'rg Tr. 56:10. Although Mr. Civera could not testify as to the overtime assignment process in 2013, he did testify as to the assignment process for other years, and Pickens provides no reason or evidentiary support to assume that the process was different in 2013.

Pickens went to his union to complain that "he wasn't getting overtime." Trial Tr. vol. 2, 142:19-23. When asked when his "opportunities for overtime stopped," he replied, "in 2012." Trial Tr. vol. 1, 17:11-16. He further testified that while he had been receiving overtime "pretty regularly" beginning in 2005, such opportunities stopped in 2012. Trial Tr. vol. 1. 16:6-9. Pickens' own testimony therefore elucidates that his overtime had already declined before he complained of discrimination. This weighs heavily against an inference that his 2013 lack of overtime was retaliatory.

Pickens' evidence of overtime retaliation in 2014 is also unavailing. Pickens earned 72.5 hours of overtime in the first quarter of that year. He provides no evidence, other than his own unsubstantiated conjecture, why the retaliation mysteriously stopped for three months in early 2014, only to resume again at the end of March. *See* Pl.'s Br. Lost Wages 6, ECF No. 77 ("It is not known why Plaintiff received overtime in the beginning of 2014 but Plaintiff suspects that Defendant was (correctly) instructed by counsel or upper management to stop retaliating against Plaintiff."). Other employees also suffered a decline in overtime pay during this same period. Although Dave Taylor earned significant overtime in the second quarter of 2014, Felipe Suarez earned a mere two hours. And Pickens earned more overtime in the first quarter of 2014 than Suarez did that entire year.

Further compounding this lack of evidence, Pickens's argument for lost overtime is rife with speculation. He asks this Court to assume the existence of overtime hours, and compensate him for them, because he "always wanted overtime work." Pl.'s Br. Lost Wages 4, ECF 77. In his brief, Pickens "suggests" that he "would have worked a similar amount" of overtime in the second quarter of 2014 as he did in the first quarter of 2014, "if given the opportunity." *Id.* at 9, ECF No. 77. Yet, although Pickens claims he "always wanted" overtime work, his counsel

8

suggested at the hearing that there were times in which he may not have wanted to work overtime, for instance, for an indeterminate amount of time after he returned from shoulder surgery in 2012. H'rg Tr. 25:18-19 (In mid-February 2012, "[p]resumably he didn't want overtime right away because he was still healing.").

Pickens also makes unsubstantiated assertions about the overtime desires of other employees. He alleges that a comparison of the overtime earned by the mechanics with less seniority than him is not relevant because "the mechanics who did not have overtime did not want overtime work." Pl.'s Br. Lost Wages 4, ECF No. 77. Pickens claims, for instance, that he has "first-hand knowledge that Butler," a less senior second-class mechanic, "does not seek nor want overtime work." *Id.* at 6. However, Pickens presents no evidence other than his own assertions. He did not call any other second-class mechanics at the hearing, provide any affidavits, or point to any testimony at trial to establish why other employees did or did not choose to work overtime when given the opportunity.

Courts have found that determining back pay is "too speculative" when the only evidence of what a plaintiff "would" have done, absent the employer's discriminatory conduct, is the plaintiff's own assertions. *McKenna v. City of Phila.*, 636 F. Supp. 2d 446, 458-9 (E.D. Pa. 2009) (declining to award back pay damages for the value of sick time or vacation time because the plaintiff's only evidence that he would have "banked" that time rather than used it was his "assertion that this would have occurred."); *Hare*, 549 F. Supp. 2d at 696 (declining to award back pay based on plaintiff's contention that she would have received bonus pay via "select[ion] for temporary promotional assignments periodically given to postal managers on an ad hoc basis."); *Curtis*, 819 F. Supp. at 459 (E.D. Pa. 1993) (declining an award of back pay stemming from overtime compensation the plaintiff "says he would have worked.").

9

Although a modicum of speculation is inherent to every front and back pay damage award, determining overtime hours requires additional guesswork. *Curtis*, 819 F. Supp. at 459. Such uncertainties are compounded in this case, in a work environment in which overtime is awarded based upon an intricate job-picking hierarchy that takes into account many shifting variables. *See* note 6, *supra*. To prove his entitlement to lost wages, Pickens would have to show that he was denied overtime that was available, within his mechanic class, for his specific job task, and that the time was awarded to a less-eligible employee instead of him. So even if Pickens did provide more evidence of his ability and willingness to work overtime for any given period, I am unable to determine whether or not overtime would have been available to him without evidence of the work group and craft seniority lists for those periods, as well as proof of the jobs that required overtime at that time. As elucidated at the June 13, 2017 hearing, there are many factors that go into the overtime assignment process on any given day—Pickens does not provide documentary proof of any of them.

Finally, the balance of equities does not favor Pickens' claim for retaliatory back pay. He did not consistently argue that he was denied overtime opportunities as retaliation for complaining of discrimination. Pickens maintained that he was denied a promotion because of discrimination, and that this denial led to a failure to earn overtime pay at a higher rate. Save a brief reference at trial and in his pretrial memorandum, he did not claim retaliation via denied overtime in his Complaint, in his proposed jury instructions, or in his proposed jury interrogatories. In his Complaint, he sought lost wages, which could plausibly include lost overtime pay, only with respect to his failure to promote claim. Compl. ¶ 34, ECF No. 1. In his proposed jury charge, he did not seek an instruction that denial of overtime pay was retaliatory. ECF No. 25. Nor did he seek a special interrogatory to that affect. Consequently, the jury was

10

not instructed on overtime as a basis for a finding of retaliation. While I do not find that Pickens waived a claim for lost overtime, in my equitable discretion I find it nonetheless weighs against him.

The party seeking lost wages has the burden to establish his or her entitlement to them. Pickens fails to meet his burden. Accordingly, Pickens' motion for back pay due to retaliatory denial of overtime pay is denied.[7]

### b. **Attorney's Fees**

Under Title VII, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ." 42 U.S.C. § 2000e–5(k). To be eligible for an attorney's fee award, a plaintiff must establish (1) that he or she is the prevailing party, and (2) that the requested fee is reasonable. *Id*. *See also Farrar v. Hobby,* 506 U.S. 103, 116–17 (1992). Pickens received nominal damages for his retaliation claim, which qualifies him as the "prevailing party." *Farrar*, 506 U.S. at 112 ("We therefore hold that a plaintiff who wins nominal damages is a prevailing party . . . ."). The only question, therefore, is what constitutes a "reasonable" attorney's fee in the context of a nominal damages case.

In *Farrar v. Hobby*, 506 U.S. 103 (1992), the Supreme Court addressed the issue of attorney's fees in cases in which the plaintiff is awarded only nominal damages. In *Farrar*, the operator of a Texas school for troubled teens sued several officers of the state, including the Lieutenant Governor, under 42 U.S.C. §1983 after the school was temporarily closed due to the

---

[7] Although he does not address the argument in the most recent briefing, Pickens' original motion for damages included a claim for lost wages for the days he appeared at trial. ECF No. 59. This claim has no merit. Litigants are generally not permitted to recover damages stemming from their participation in the litigation process itself. *See Leporace v. N.Y. Life & Annunity Corp.*, 2014 WL 1806788, at *3 (E.D. Pa. May 7, 2014) ("[A] lawsuit . . . is the plaintiff's decision, and imposing additional damages on the defendant for defending against the plaintiff's claims would impair the defendant's right to defend himself."); *see also Stoleson v. U.S.*, 708 F.2d 1217, 1223 (7th Cir. 1983) ("It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages . . . .").

death of a student. 506 U.S. at 104-106. Plaintiff Joseph Farrar, ultimately seeking $17 million in damages, alleged a deprivation of liberty and property without due process, as well as malicious prosecution and conspiracy. *Id.* At trial, the jury found through special interrogatories that Defendant William Hobby, the Lieutenant Governor, had "committed an act or acts under color of state law that deprived Plaintiff Joseph Davis Farrar of a civil right," but found Hobby was not "a proximate cause of any damages" incurred by Farrar. *Id.* at 106. Farrar was initially denied nominal damages, but then awarded them upon remand by the Fifth Circuit. *Farrar v. Cain*, 756 F.2d 1148 (1985). On remand, the district court utilized the lodestar method in calculating attorney's fees, multiplying the number of hours expended by a reasonable hourly rate. The district court awarded over $300,000 in attorney's fees, expenses and interest. *Farrar*, 506 U.S. at 106.

Reviewing this fee award, the Supreme Court held that a plaintiff earning nominal damages is a "prevailing party" because a nominal award "materially alters the legal relationship between the parties." 506 U.S. at 114 (citation omitted). As a prevailing party, the Court found Farrar eligible for a "reasonable" attorney's fee award. But the Court nonetheless vacated the attorney's fees entirely, reasoning that Farrar's "technical" or *de minimis* victory did not warrant any fee, much less an award of the full lodestar amount. *Id*. at 115-116. The critical factor in analyzing reasonableness of the fee award, the Court found, was "the degree of the plaintiff's overall success." *Id.* at 114. (citing *Hensley v. Eckerhart,* 461 U.S. 424 (1983). In a case where the plaintiffs "received nominal damages instead of the $17 million in compensatory damages that they sought," the litigation "accomplished little," beyond "moral satisfaction." *Id*. (citation omitted). The Court found that when a plaintiff receives "partial or limited success," by only receiving nominal damages, calculating attorney's fees using the lodestar method "may [yield]

12

an excessive amount." *Id.* (citing *Hensley,* 461 U.S. at 436). Because the District Court did not "engag[e] in any measured exercise of discretion," and merely awarded the full lodestar, the award was inappropriate. *Id.*

The *Farrar* Court explained that "the only reasonable fee" in a nominal damages case "is usually no fee at all," but did not expound on what separates "usual" cases from unusual ones. *Id.* at 115. Justice O'Connor, writing separately in a concurrence, pointed to three factors courts may look to in making this determination: (1) the "extent of relief," (2) the "significance of the legal issue on which the plaintiff prevailed," and (3) the "public purpose served" by the plaintiff's success." *Id.* at 122 (O'Connor, J., concurring). Justice O'Connor, evaluating the above factors, explained that the *de minimis* nature of Farrar's victory was "readily apparent." *Id.* After ten years of litigation and a demand of $17 million, Farrar obtained an enforceable judgement against only one of six defendants, the "least culpable one," which stood little chance of deterring any future defendant's conduct. *Id.* Under these facts, Farrar's victory was clearly "a hollow one." *Id.* at 121-22.

*Farrar* established that a district court's "central" responsibility in fixing a fee award in nominal damages cases is to "make the assessment of what is a reasonable fee under the circumstances." *Id.* at 114-15 (citing *Blanchard v. Bergeron,* 489 U.S. 87, 96 (1989)). This requires giving "primary consideration [to] the amount of damages awarded as compared to the amount sought." *Id.* at 115. (quoting *Riverside v. Rivera,* 477 U.S. 561, 585 (1986) (Powell, J., concurring)). It does not mean, however, automatically denying an attorney's fee request in every nominal damages case—as the Third Circuit has recognized, that is exactly what *Farrar* does not require. *See Jama v. Esmor Corr. Servs., Inc.*, 577 F.3d 169, 176 (3d Cir. 2009) ("[W]e

find no case in which a court of appeals has interpreted *Farrar* to require the automatic denial of fees . . . when only nominal damages are awarded. We agree with our sister courts . . . .).[8]

*Farrar* grants me "substantial discretion to decide whether no fee or some fee would be reasonable, as long as [I] acknowledge that a nominal damages award is presumptively a technical victory that does not merit an award of attorneys' fees." *Velius v. Twp. of Hamilton*, 466 F. App'x 133, 140–41 (3d Cir. 2012). In deciding to award "some fee," I am permitted to look to the O'Connor factors for "guidance." *Mitchell v. City of Phila.*, No. 99-6306, 2010 WL 1370863, at *4 (E.D. Pa. Apr. 5, 2010). With this presumption in mind, I am therefore tasked with evaluating the individualized circumstances of the case before me, informed by Justice O'Connor's factors, to arrive at a reasonable award.

    *i.    Extent of Relief*

The "primary consideration" in determining reasonableness is the extent of relief—the amount of damages awarded compared to the amount sought. *Farrar*, 506 U.S. at 114. In *Farrar*, the plaintiff demanded $17 million from six defendants, and was awarded one dollar from one defendant. *Id*. Here, Pickens did not request a specific damages amount in his Complaint, and did not itemize his noneconomic damages in his pretrial memorandum, but made a settlement demand of $60,000 and received one dollar at trial. Pl.'s Br. Attorney's Fees 8 n. 3, ECF No. 76. Pickens was denied relief entirely on one of his two claims, and received drastically less in damages than he sought on the other. But even a ratio of 60,000 to one "pales in comparison to

---

[8] The *Jama* court ruled that in determining fee awards in nominal damages cases, district courts "should consider" Justice O'Connor's factors. 577 F.3d 169, 176 (3d Cir. 2009). Subsequent, non-precedential opinions of this Circuit make clear that although the O'Connor factors have been "cited favorably," they are not mandatory. *Velius v. Twp. of Hamilton*, 466 F. App'x 133, 141 (3d Cir. 2012). "*Farrar* does not establish any rule strictly governing when a nominal damages award signals *de minimis* success or dictating how fees must be calculated if a court determines that a low fee is appropriate. The only requirement that remains intact for awarding attorneys' fees in nominal damages cases is that if the court decides to award something other than no fee or a low fee, it must conduct a lodestar analysis." *Id*.

the discrepancy presented in *Farrar*." *Jones v. Lockhart*, 29 F.3d 422, 424 (8th Cir. 1994) (awarding $10,000 in attorney's fees in a civil rights case after finding a ratio of $860,000 sought and $2 recovered to be far less extreme than *Farrar*).

Further, Pickens' case was not predicated exclusively on extracting damages from a former employer. "Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion). A unanimous jury found that the treatment Pickens endured was an intolerable violation of his civil rights. Despite failing to prove compensable injury, Pickens established this violation, and the ratio of sought relief to the relief he achieved is not as extreme as the discrepancy in *Farrar*. This factor therefore weighs slightly in favor of awarding Pickens a low fee.

  *ii.* *Significance of legal issue*

Courts consider vindication of a Title VII right "significant." *Hare*, 549 F. Supp. 2d at 707 (E.D. Pa. 2008) (awarding attorney's fees on a hostile work environment claim in which the plaintiff earned injunctive relief but no damages). *See also Jones*, 29 F.3d at 424 ("[C]ivil rights litigation serves an important public purpose . . . vindicating a policy that Congress considered of the highest priority.") (citations omitted); *Gudenkauf v. Stauffer Commc'ns, Inc.*, 158 F.3d 1074, 1081 (10th Cir. 1998) ("A verdict for a plaintiff in a mixed motive Title VII case constitutes a victory on a significant legal issue . . . notwithstanding the fact that a plaintiff recovers no damages."). A jury finding of liability in a Title VII case is important, especially when "compared to the injury to a business interest alleged in *Farrar*." *Jones,* 29 F.3d at 424. This factor as well weighs slightly in favor of a low fee award.

15

### iii. *Public goal*

Finally, a low fee may be reasonable when the litigation serves a "public purpose," which can include "deter[ring] future lawless conduct." *Farrar*, 506 U.S. at 122. But the deterrent value of a verdict is limited when it does not identify with specificity the conduct the jury found unlawful. *Id.* Nonetheless, Title VII plaintiffs, of course, serve public ends by acting as private attorneys general when they prosecute their civil rights in the manner Congress intended. *Christiansburg Garment Co. v. EEOC.,* 434 U.S. 412, 418 (1978) (Title VII plaintiffs are the "chosen instrument of Congress to vindicate a policy that Congress considered the highest priority.") (citation omitted).

In this case, the deterrent value of the verdict is limited because it does not specify which actions, among the multitude presented, the jury found to be retaliatory. ECF No. 61. But the generality of the court-drafted verdict sheet should not be held entirely against Pickens. Even a finding of nonspecific nominal liability can further a public goal when it puts an employer "on notice" that reform is needed. *Brandau v. Kansas*, 168 F.3d 1179, 1183 (10th Cir. 1999) (affirming fee award of $41,598.13 for plaintiff who received $1.00 on a hostile work environment claim but failed on constructive discharge and retaliation). That effect is amplified when the employer in question is a public entity. *See id.* ("These results—vindicating rights secured by Title VII and providing a broad constitutional benefit to other employees of [the state and local government]—are in the interests of the public . . ."). *See also Hare*, 549 F. Supp. 2d at 692 (verdict against postal service). SEPTA is a state-funded entity whose behavior, as an employer or otherwise, affects millions of people in this Commonwealth. This factor weighs slightly in Pickens' favor.

Considering the above factors, awarding attorney's fees in this case utilizing the full lodestar method would undoubtedly yield "an excessive amount." *Farrar*, 506 U.S. at 114 (quoting *Hensley,* 461 U.S. at 436). Pickens' limited degree of success warrants a very significant reduction from the $385,051 he requests. Yet, Pickens achieved an important finding of liability against a public entity, and attorneys should not be discouraged from proceeding with cases that vindicate civil rights but may not have the potential for high damages. "A reasonable fee is one that is adequate to attract competent counsel, but which does not produce a windfall for attorneys." *Spencer v. Wal-Mart Stores, Inc.*, No. 03-104, 2005 WL 3654381, at *2 (D. Del. June 24, 2005), *aff'd,* 469 F.3d 311 (3d Cir. 2006) (citation omitted).[9]

In my "substantial discretion to decide whether no fee or some fee would be reasonable," *Velius*, 466 F. App'x at 140–41, I award Pickens $15,000.

    iv. **Costs**

Pickens also seeks costs in the amount of $5,921.81, pursuant to Fed. R. Civ. P. 54 and 28 U.S.C. §1920. Ordinarily, a party seeking costs must first submit a bill of costs to the Clerk for taxation. Local R. Civ. P. 54.1(b) ("All bills of costs requiring taxation shall be taxed by the Clerk."). *See also Yarnall v. Philadelphia Sch. Dist.*, 203 F. Supp. 3d 558, 569 (E.D. Pa. 2016) ("A bill of costs under § 1920 should be determined in the first instance by the Clerk of Court."); *accord McKenna*, 582 F.3d at 454 n.6.

Pursuant to Local Rule 54.1(d), this Court provides a bill of costs form in which a prevailing party may outline and itemize the costs he or she is entitled to. *See* "Bill of Costs,"

---

[9] A reasonable attorney's fee award must take into account whether or not a plaintiff's lawyer is incentivized to take on borderline cases like Pickens'. Pickens' case, despite its flaws, was indeed worthy of "attract[ing] competent counsel," *Spencer v. Wal-Mart Stores, Inc.*, No. 2005 WL 3654381, at *2. Although Pickens' credibility as a witness was called into question by his history of filing employment discrimination suits, he nonetheless presented John Egan, a fellow employee, to testify movingly and credibly on his behalf. I therefore have considered the fact that Pickens' counsel was willing to take on this case in determining the reasonableness of the fee.

17

*available at* https://www.paed.uscourts.gov/documents/locrules/civil/cvrules.pdf . This form is to be presented to the Clerk of Court for a taxation of costs, subject to review by this Court. Fed R. Civ. Pro. 54(d)(1). *See generally In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 455 (3d Cir. 2000). Pickens has not met this necessary prerequisite to an award of costs, therefore his claim for costs is denied without prejudice.

### III. CONCLUSION

For the reasons outlined above, Pickens' motion for back pay is denied. His motion for attorney's fees and costs is granted in part and denied in party—I award Pickens $15,000 in attorney's fees, and deny his motion for costs without prejudice.

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:  Copies **MAILED** on _____ to